UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Fairview Health Services, *d/b/a University of Minnesota Medical Center*,

        Plaintiff,

v.

Armed Forces Office of the Royal Embassy of Saudi Arabia,

        Defendant.

File No. 21-cv-2666 (ECT/TNL)

**OPINION AND ORDER**

---

David P. Bunde, Pari McGarraugh, Jacob Patsch Harris, and William Thomas Wheeler, Fredrikson & Byron, P.A., Minneapolis, MN, for Plaintiff Fairview Health Services, *d/b/a University of Minnesota Medical Center*.

Aaron B. Chapin, Husch Blackwell LLP, Chicago, IL, and Cormac Connor and George Edward Stewart, III, Husch Blackwell LLP, Washington, DC, for Defendant Armed Forces Office of the Royal Embassy of Saudi Arabia.

---

Plaintiff Fairview Health Services brought this case seeking to recover more than $1.3 million in medical bills from Defendant Armed Forces Office of the Royal Embassy of Saudi Arabia. The Armed Forces Office seeks dismissal on three alternative grounds. It argues: (1) that the Foreign Sovereign Immunities Act deprives the court of subject-matter jurisdiction over Fairview's claims; (2) that Fairview has failed to allege facts plausibly supporting its contractual and equitable claims; and (3) that Fairview failed to join a required party under Federal Rule of Civil Procedure 19. The Armed Forces Office's motion will be denied. The better answer is that the conduct underlying Fairview's claims

was commercial activity, an exception to foreign sovereign immunity. Fairview plausibly alleges its claims. And no unnamed party is required in the Rule 19 sense.

I[1]

From June 2018 through December 2019, Fairview, doing business as the University of Minnesota Medical Center, treated two children whose father is a current or former member of the Saudi Arabia armed forces. Compl. [ECF No. 1] ¶¶ 7–8. The treatment ultimately generated more than $1,301,272.85 in negotiated charges, "a discount from Fairview/UMMC's billed charges." *Id.* ¶ 13.

Fairview does not typically bill a foreign patient or entity directly for services rendered to foreign citizens. Rather, such bills are funneled through an intermediary, which bills the patient or entity responsible for payment and collects the payment. *Id.* ¶ 5. Before the spring of 2018, the intermediary Fairview used was Minnesota International Medicine, or "MIM." *Id.* In May 2018, however, another company purchased MIM, and Fairview did not renew its agreement for foreign intermediary billing services with the new company. *Id.* ¶ 6. Fairview does not specify how it billed foreign patients after its relationship with MIM ended. The Complaint quotes a third party as saying that MIM filed for bankruptcy protection, but neither party has filed any information regarding MIM's status. *Id.* ¶ 22.

---

[1]     In accordance with the standards governing a Rule 12(b)(6) motion, the facts are drawn entirely from the Complaint and materials it necessarily embraces. *See Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017); *see also Greene v. Osborne-Leivian*, No. 19-cv-533 (ECT/TNL), 2021 WL 949754, at *2 n.3 (D. Minn. Mar. 12, 2021), *aff'd*, No. 21-1937, 2021 WL 5121256 (8th Cir. 2021).

According to Fairview, in 2019, a corporation—Medical Cost Advocate, Inc.—telephoned Fairview's billing department to say that the Armed Forces Office had been trying to pay its Fairview bills with MIM but had been unable to reach MIM.  *Id.* ¶¶ 9–10. Fairview and Medical Cost Advocate, acting as the Armed Forces Office's agent, then negotiated a series of contracts with Fairview called "Preferred Rate Agreements," reflecting a "Charged Amount," a "Negotiated Reduction," and an "Agreed Upon Amount," to settle the bills.  *Id.* Ex. A [ECF Nos. 1-1, 1-2].  With a single exception, the Preferred Rate Agreements provided that they were "the full understanding between Fairview Health Services and Medical Cost Advocate, Inc., (acting as agent on behalf of Armed Forces Office of the Royal Embassy of Saudi Arabia)."  *Id.*  The exception is the second agreement appended to the Complaint, which provides that it is between "Minnesota Medicine-Fairview Hosp and Medical Cost Advocate, Inc. (acting as agent on behalf of Armed Forces Office of the Royal Embassy of Saudi Arabia)."  *Id.*, Ex. A [ECF No. 1-1] at 2.[2]  The Preferred Rate Agreements are dated June 20, 2019; although the Agreements contain a date-of-services field and an invoice-number field, those fields are redacted in Fairview's exhibits to the Complaint, and Fairview did not include the underlying invoices in the exhibits to the Complaint.

After the parties entered into these Preferred Rate Agreements, Fairview instructed Medical Cost Advocate that all checks should be sent to Fairview's mailing address, to the attention of Maureen Ring, a Fairview billing manager.  Compl. ¶ 15.  When Fairview did

---

[2]      For convenience, citations are to ECF pagination, not a document's original pagination.

not receive any payments, Medical Cost Advocate reminded the Armed Forces Office that payments were to be made to Fairview and sent to Ms. Ring's attention. *Id.* ¶ 16. The Armed Forces Office repeatedly insisted that it had made the payments as requested. *Id.* ¶¶ 17, 21, 22. In fact, however, although the Armed Forces Office sent checks to Fairview at the address provided, the checks were payable to "Minnesota Medicine" and the payments did not reference Ms. Ring. *Id.* ¶ 23. It appears that someone in the Fairview mailroom redirected the checks to Minnesota Medicine, which presumably cashed them. *Id.* ¶¶ 23–24. Fairview thus has not received any payment for the services rendered. *Id.* ¶ 25.

The Armed Forces Office has attached to its motion the relevant invoices and bills related to each Preferred Rate Agreement attached to the complaint, along with the accompanying Agreements with the date and invoice fields unredacted. The invoices were issued by "Minnesota Medicine"—on dates months after the Fairview/MIM agreement ostensibly ended—with a stamp on the bottom of the document reflecting that "Minnesota Medicine" is "Minnesota International Medicine," Fairview's former foreign-citizen billing partner. *Compare* Connor Decl. [ECF No. 27] Ex. A (Minnesota Medicine invoice #5989 dated Sept. 1, 2018, for services from 8/1/2018 to 8/30/2018 with accompanying Preferred Rate Agreement referencing same dates of service and invoice number 5989, providing for "Agreed Upon Amount" of $7741.22, and copy of a check in that amount made out to Minnesota Medicine) *with* Compl. Ex. A [ECF No. 1-2] at 5 (Preferred Rate

Agreement with "Agreed Upon Amount" of $7741.22 with invoice number and dates of service redacted).[3]

Fairview filed suit in December 2021, claiming breach of contract, quantum meruit, and breach of the implied covenant of good faith and fair dealing. Because of delays in effecting service, Defendant did not enter an appearance until February 2023. This motion to dismiss followed.

## II

## A

The first issue is whether the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, deprives the court of subject-matter jurisdiction over the Armed Forces Office, making dismissal necessary under Rule 12(b)(1). "A court deciding a motion under Rule 12(b)(1) must distinguish between a 'facial attack' and a 'factual attack.'" *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (quoting *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507, 511 (5th Cir. 1980)). In a facial attack, review is restricted to the pleadings. *Id.* "[T]he non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Id.* A

---

[3]    Fairview argues that it would be improper to consider these materials because they are not embraced by the pleadings. Fairview does not dispute the documents' authenticity, however, and it seems clear that invoices underlying the Preferred Rate Agreements are part of those Agreements. *See Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 931 & n.3 (8th Cir. 2012) (stating "materials that are necessarily embraced by the pleadings" on a Rule 12(b)(6) motion include "matters incorporated by reference or integral to the claim" and "exhibits attached to the complaint whose authenticity is unquestioned"). The complete invoices are properly considered.

factual attack, on the other hand, allows consideration of matters outside the pleadings and the Rule 12(b)(6) safeguards do not apply. *Id.*

Here, the Armed Forces Office's Rule 12(b)(1) motion represents a facial attack. The motion is based on the Complaint's allegations and materials embraced by the Complaint. Therefore, the familiar Rule 12(b)(6) standards apply. In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). Although the factual allegations need not be detailed, they must be sufficient "to raise a right to relief above the speculative level. . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Under the FSIA, a foreign state is generally immune from liability in United States courts. 28 U.S.C. § 1602. The FSIA sets out several exceptions to a foreign sovereign's immunity, however. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493 (1983) ("subject matter jurisdiction in any . . . action [against a foreign sovereign] depends on the existence of one of the specified exceptions to foreign sovereign immunity"). Relevant here, the FSIA provides that a foreign state's immunity does not extend to a lawsuit "based upon" the foreign state's "commercial activity carried on in the United States." 28 U.S.C. § 1605(a)(2).

6

Begin with whether the conduct giving rise to Fairview's claims constitutes "commercial activity."  The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act."  *Id.* § 1603(d).  To determine whether a particular activity is commercial activity, the statute instructs courts to examine "the nature of the course of conduct or particular transaction or act, rather than . . . its purpose."  *Id.*; *see also Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992).[4]  "To be considered 'commercial,' an activity must be the *type* of activity by which a private party engages in trade or commerce."  *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 772 (2019) (quotations omitted).  "Put differently, a foreign sovereign's acts are 'commercial' within the meaning of the FSIA when the sovereign 'acts, not as a regulator of a market, but in the manner of a private player within it.'"  *Virtual Countries, Inc. v. Republic of S. Afr.*, 148 F. Supp. 2d 256, 264 (S.D.N.Y. 2001) (quoting *Weltover,* 504 U.S. at 614).  "The negotiation of contracts . . . clearly is the type of act performed by private persons."  *United States v. Moats*, 961 F.2d 1198, 1205 (5th Cir. 1992).  But "certain contracts, although generally of a type in which a private person could enter, are by their nature governmental, since only a sovereign entity deals in the particular kind of goods or services."  *Rush-Presbyterian-St. Luke's Med. Ctr.*, 877 F.2d at 578.

---

[4]     The statute's line between "nature" and "purpose" does "not demark hermetically sealed, separate domains."  *Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic*, 877 F.2d 574, 577 (7th Cir. 1989); *see also De Sanchez v. Banco Central de Nicaragua,* 770 F.2d 1385, 1393 (5th Cir. 1985) ("Often, the essence of an act is defined by its purpose.").

*Rush* shows why the commercial activities exception applies here.  There, the Greek government contracted with a hospital and organ bank in Illinois to provide kidney transplants for Greek citizens.  *Id.* at 575.  Under the Greek constitution, the Greek government is obligated to provide health care services to its citizens, but kidney transplants are not widely available in Greece.  *Id.*  When Greece failed to pay the medical bills for several transplants, the hospital and an organ bank brought suit for breach of contract and quantum meruit.  *Id.* at 576.  The Greek government argued that it was immune from suit under the FSIA because the activity at issue was the provision of health benefits to Greek citizens, a governmental act.  *Id.* at 580.  The Seventh Circuit rejected this contention.  It found that the government's reliance on its obligation to provide health care impermissibly focused on the "purpose" for which Greece entered the agreements, and not the "nature" of those agreements.  *Id.*  As the court noted: "Rather than look to the purpose of the agreement, we must ask whether private parties ever enter contracts to reimburse health care providers for medical services performed on third parties."  *Id.* at 580–81.  Because such contracts are routine and are not limited to governmental entities, the contracts were not "uniquely governmental" and therefore were commercial activity for purposes of FSIA immunity.  *Id.* at 581.

The Armed Forces Office relies on *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020 (D.C. Cir. 1997), which also involved the provision of health care services by a foreign sovereign.  But the immunity granted in *Jungquist* rested primarily on official immunity under the FSIA rather than the commercial-activity exception.  And the *Jungquist* court also found that the contracting party did not have FSIA immunity.

*Jungquist* involved serious injuries an American teenager suffered after she fell from a yacht belonging to of a member of the Abu Dhabi royal family, Sheikh Sultan Bin Khalifa Al Nahyan. *Id.* at 1023. After the accident—which the plaintiffs alleged was caused by the Sheikh's alcohol use—Sheikh Sultan promised the girl's family that he would pay all her medical expenses and care. *Id.* For more than a year, as she received care in Abu Dhabi, Germany, and the United States, Sheikh Sultan instructed Khalil I. Al-Malki and Osama Al Baba to pay her medical and other expenses. *Id.* at 1023–24. Al-Malki was the United Arab Emirates'[5] Medical Attaché; Al Baba was the director of patient relations for the UAE's foreign medical treatment program. *Id.* at 1028–29. When Sheikh Sultan abruptly stopped paying for the girl's care, the girl's parents brought suit, asserting tort and conspiracy claims against eight defendants, including Sheikh Sultan, Al-Malki, and Al Baba, and a breach-of-contract claim against Sheikh Sultan alone. *Id.* at 1024. The D.C. Circuit found that FSIA immunity protected Al-Malki and Al Baba from suit because they were acting in their official capacities as representatives of the Abu Dhabi government when arranging payment for the girl's care and were thus an "agency or instrumentality" of the foreign state. *Id.* at 1030; *see also* 28 U.S.C. § 1603(a). The court also noted that the Jungquists had not entered into a contractual relationship with either Al-Malki or Al Baba, but rather that these "two officials fulfilled Sheikh Sultan's obligations to the Jungquists by performing their official tasks as administrators of a government program to provide for the health and welfare of Abu Dhabi's citizens and residents." *Jungquist*, 115

---

[5]    "Abu Dhabi is one of the seven autonomous emirates that form the United Arab Emirates." *Id.* at 1023 n.1.

F.3d at 1030.  But while these two defendants were entitled to immunity, the court specifically found that Sheikh Sultan's promises to the Jungquists "supported the district court's exercise of subject matter jurisdiction" over him under the commercial-activity exception to the FSIA, although it ultimately concluded that the exercise of personal jurisdiction was not appropriate.  *Id.* at 1030–31.  *Jungquist* does not stand for the proposition that the Armed Forces Office here is entitled to immunity under the FSIA.

The Armed Forces Office relies on two additional decisions interpreting the FSIA in the context of the provision of healthcare, *Elbasir v. Kingdom of Saudi Arabia*, 468 F. Supp. 2d 155 (D.D.C. 2007), and *Salman v. Saudi Arabian Cultural Mission*, No. 1:16cv1033 (JCC/IDD), 2017 WL 176576 (E.D. Va. Jan. 17, 2017).  Neither persuasively contradicts *Rush*.

Taha Elbasir was a Sudanese national living in Saudi Arabia when he was struck and injured by a car driven by a member of the Saudi royal family.  *Elbasir*, 468 F. Supp. 2d at 157.  The Saudi government allegedly promised to pay for his medical and related expenses in exchange for him not reporting the accident to the police.  *Id.*  Eventually, Elbasir came to the United States for treatment.  *Id.* at 158.  He contended that various Saudi individuals made three separate promises to him in the course of his treatment:  a promise to pay for his medical care, a promise to pay his family's living expenses, and a promise to pay for the family to travel to the United States for Elbasir to receive treatment.  *Id.* at 162.  In the lawsuit, Elbasir alleged that the Saudi government breached the first two agreements.  *Id.*  Because Elbasir resided in Saudi Arabia at the time of the accident, he was a beneficiary of Saudi Arabia's national healthcare system.  *Id.* at 161.  The district

court concluded that the involvement of the Saudi healthcare system meant that FSIA immunity applied to the first breach claim, citing *Jungquist* for the proposition that the "administrat[ion] of a government program to provide for the health and welfare of [a sovereign's] citizens and residents" was not "commercial activity" under the FSIA. *Id.* (quoting *Jungquist*, 115 F.3d at 1030). The court held that FSIA immunity did not apply to the second breach claim because the motion to dismiss failed to address that aspect of the claims. *Id.* at 162. But *Jungquist* does not stand for the broad proposition that any involvement of a nation's healthcare system means that the "commercial activity" exception does not apply. In *Jungquist* itself, although the UAE's healthcare system paid for the medical care, the court determined that FSIA immunity did not apply to the breach-of-contract claim against Sheikh Sultan for allegedly breaching his agreement to pay healthcare expenses. Rather, FSIA immunity was available only to two administrators of the healthcare system acting in their official capacities. *Elbasir*'s extension of *Jungquist* as applying FSIA immunity whenever a foreign nation's healthcare system is involved is unwarranted.

In *Salman*, an individual employed by the Saudi government in the United States sued the government for sexual harassment and employment discrimination he allegedly suffered at the hands of his supervisor. 2017 WL 176576, at *1. The plaintiff's job was to distribute financial aid to Saudi citizens studying in the United States and to provide other services to those citizens. *Id.* at *4. Focusing on "the nature of the conduct undertaken by the foreign state itself and the individual's role in that activity," *id.*, the court found that the commercial-activity exception to FSIA immunity did not apply. The court noted that

a free college education is a public benefit in Saudi Arabia, and the plaintiff was "at bottom, tasked with distributing [that] public benefit to Saudi students studying in the United States." *Id.* at *5. This provision of a public benefit is "quintessentially an act 'peculiar to sovereigns.'" *Id.* (quoting *Butters v. Vance Int'l, Inc.*, 225 F.3d 462, 465 (4th Cir. 2000)).[6] The Armed Forces Office highlights this rationale, contending that, because healthcare is a public benefit for Saudi citizens, the underlying activity here, like that in *Salman*, is not commercial. But the conduct at issue here is not the administration of the public benefit; it is paying the bills that come due as a result of the public benefit. Because the FSIA directs courts to consider whether the underlying conduct is commercial in nature, it is important to focus on the specific conduct "rather than the broad program or policy of which the individual transaction is a part." *Rush*, 877 F.2d at 580. The better answer is that the FSIA commercial-activity exception applies.[7]

Next consider whether the Armed Forces Office carried on a commercial activity in the United States. The commercial-activity exception provides that it must be "based upon a commercial activity carried on in the United States *by the foreign state*." 28 U.S.C. §

---

[6]    The *Salman* court also found it significant that the Saudi government "did not buy or sell anything" in that case. 2017 WL 176576, at *5. Rather, the government's involvement was "effectuat[ing] its educational policy," an activity that could have "political, cultural, and religious components," making judicial interference untenable. *Id.* (quoting *Butters*, 225 F.3d at 465).

[7]    Fairview and the Armed Forces Office acknowledge that there are no Supreme Court or Eighth Circuit decisions directly on point. The Eighth Circuit has emphasized, however, that "sovereign immunity [under the FSIA] is the exception, rather than the rule, and should be confined to a foreign sovereign's truly governmental acts and not extended to strictly commercial activities." *McDonnell Douglas Corp. v. Islamic Republic of Iran*, 758 F.2d 341, 348 (8th Cir. 1985).

1605(a)(2) (emphasis added).  The Armed Forces Office argues that it did not engage directly with Fairview but acted only through intermediaries such as MIM and Medical Cost Advocate.  ECF No. 26 at 20.  This contention is not persuasive.

"[I]n appropriate circumstances the activities of another may be attributed to the foreign state for purposes of the [commercial activity] exception."  *Mar. Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1105 (D.C. Cir. 1982); *see also* <u>BP Chems. Ltd. v. Jiangsu Sopo Corp.</u>, 285 F.3d 677, 687 (8th Cir. 2002) ("A foreign state can surrender its immunity by virtue of activities committed by its agent.").  The legislative history of the FSIA supports this view.  Congress noted that an example of an "act performed in the United States in connection with a commercial activity of the foreign state elsewhere," 28 U.S.C. § 1605(a)(2), would be "a representation in the United States by an agent of a foreign state that leads to an action for restitution based on unjust enrichment." H.R. Rep. No. 94-1487, at 19 (1976), *reprinted in* 1976 U.S.S.C.A.N. 6604, 6617.  It is well-settled that an agent can bind a sovereign principal for purposes of the commercial-activity exception.  *E.g.*, *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs., Co.*, 199 F.3d 94, 98 (2d Cir. 1999) (noting for purposes of FSIA immunity that "the corporate form may be disregarded 'where a corporate entity is so extensively controlled by its owner that a relationship of principle and agent is created'") (quoting *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 629–30 (1983)); *Virtual Def. & Dev. Int'l, Inc. v. Republic of Moldova*, 133 F. Supp. 2d 1, 5 (D.D.C. 1999) ("If the commercial activity is characterized as the actions taken by Virtual in its authority as an agent of Moldova, then the first clause of the commercial activity exception of the FSIA[—that the

13

action is based on commercial activity in the United States by the foreign state—]is satisfied.").

Here, the Preferred Rate Agreements provide specifically that the parties to the Agreements are Fairview and the Armed Forces Office of the Royal Embassy of Saudi Arabia. Compl. Ex. A. Those Agreements also state that Medical Cost Advocate, Inc. is "acting as agent on behalf of Armed Forces Office of the Royal Embassy of Saudi Arabia." *Id.* The Armed Forces Office does not dispute that Medical Cost Advocate was its agent. To the extent the Armed Forces Office contends that its only "engagement" with Fairview was through MIM, that argument is belied by the Preferred Rate Agreements, which show that the Armed Forces Office, through its agent Medical Cost Advocate, directly contracted with Fairview. For purposes of this motion, Fairview has plausibly alleged that Fairview's contracts with Medical Cost Advocate constituted contracts with the Armed Forces Office because Medical Cost Advocate was the Armed Forces Office's agent.

B

Foreign sovereign immunity aside, the Armed Forces Office argues that the Complaint fails to state any claim on which relief may be granted and seeks dismissal under Rule 12(b)(6). Fairview asserts three claims in its Complaint, the first for breach of contract, the second for quantum meruit, and the third for breach of the implied covenant of good faith and fair dealing. Consider each in turn.

The Armed Forces Office contends that Fairview cannot plausibly plead a breach-of-contract claim because the Preferred Rate Agreements themselves establish that no enforceable contract was formed. According to the Armed Forces Office, the Preferred

Rate Agreements omitted two essential terms: the payee's name and the address where payments should be sent. The formation of a contract requires an offer, acceptance, and consideration. *Bohnhoff v. Wells Fargo Bank, N.A.*, 853 F. Supp. 2d 840, 854 (D. Minn. 2012). The offer must be specific enough to be enforced. *See Neb. Beef, Ltd. v. Wells Fargo Bus. Credit, Inc.*, 470 F.3d 1249, 1251 (8th Cir. 2006). The Preferred Rate Agreements, as the Complaint alleges, meet these essential elements. The Agreements specify the parties' identities, the entity to whom payment should be directed, and the amount of the payment due. Both parties signed the Agreements, evidencing their acceptance of the terms. The Agreements provide that the amount due is "due to the Facility," which is defined—in all but one Agreement—as "Fairview Health Services d/b/a University of Minnesota Medical Center, Fairview." And the checks the Armed Forces Office filed with its motion show that payment was not made to Fairview Health Services. Rather, every check was made payable to "Minnesota Medicine."[8] Fairview has alleged facts plausibly showing that the Armed Forces Office breached enforceable contracts.

Contract formation aside, the Armed Forces Offices says that the Preferred Rate Agreements include a covenant barring this suit. Each Agreement provides that Fairview "also shall not file arbitration or suit with regards to this bill." Compl. Ex. A. Fairview's response shows why this argument is not an appropriate ground for a 12(b)(6) dismissal.

---

[8]    The Armed Forces Office asserts that its delivery of checks to MIM was consistent with the parties' prior practice. Whether prior practice might excuse a breach is not an issue that can be resolved on a motion to dismiss. *Stephenson v. Deutsche Bank AG,* 282 F. Supp. 2d 1032, 1065 (D. Minn. 2003) (recognizing that affirmative defenses are "generally 'not a basis for a motion to dismiss under 12(b)(6) but rather a matter to be pleaded as an affirmative defense.'").

According to Fairview, "this bill" means the original amount due, not the negotiated amount due, so that Fairview's promise not to sue was merely a promise not to pursue the Armed Forces Office for the amount originally billed (as distinguished from the discounted amount). Fairview's interpretation of this clause is reasonable, meaning at least that resolution of this dispute requires adjudication of fact questions.

The Armed Forces Office argues that Fairview cannot bring a claim for quantum meruit when there is an express contract, and that even if the parties' agreements are not enforceable, Fairview cannot establish that any alleged enrichment was unjust for purposes of a quantum meruit claim. These arguments are not persuasive in this procedural context. A plaintiff is entitled to plead claims in the alternative, including breach of contract and quantum meruit. *Gisairo v. Lenovo (United States) Inc.*, 516 F. Supp. 3d 880, 893 (D. Minn. 2021) ("Because Rule 8(d)(2)–(3), Fed. R. Civ. P., expressly permits a party to plead alternative or inconsistent claims or defenses, courts routinely decline to dismiss unjust-enrichment claims when pleaded in the alternative."). And Fairview alleges facts plausibly showing the elements of a quantum meruit claim under Minnesota law. *See Busch v. Model Corp.*, 708 N.W.2d 546, 552 (Minn. Ct. App. 2006) ("A party may recover under quantum meruit where he or she has conferred a benefit to another and has not received reasonable compensation for this act."). Fairview alleges that it provided services to the Armed Forces Office and has not been paid for those services.

The Armed Forces Office pins its argument for dismissal of Fairview's claim for breach of the implied covenant of good faith and fair dealing on the dismissal of Fairview's breach-of-contract claim. *See* ECF No. 36 at 9 (arguing that if the "breach of contract

claim is dismissed, then this claim too must be dismissed"). Fairview's breach claim survives, meaning this claim does, too.

C

The Armed Forces Office argues that the case must be dismissed under Rule 12(b)(7) for failure to join two necessary parties, MIM and Medical Cost Advocate. A motion under Rule 12(b)(7) for failure to join a required party under Rule 19 is "warranted only when the defect is serious and cannot be cured." *Direct Supply, Inc. v. Specialty Hosps. of Am., LLC,* 878 F. Supp. 2d 13, 23 (D.D.C. 2012) (citations omitted). Although the complaint's allegations are accepted as true, matters outside the pleadings may also be considered when determining whether Rule 19 requires that a party be joined. *Omega Demolition Corp. v. Hays Grp., Inc.*, 306 F.R.D. 225, 227–28 (D. Minn. 2015). The party seeking dismissal for failure to join a required party has the burden to produce "evidence showing the nature of the interest possessed by an absent party and that the protection of that interest will be impaired by the absence." *Id.* (quoting *Sykes v. Hengel,* 220 F.R.D. 593, 596 (S.D. Iowa 2004)).

Rule 19 provides that, if "joinder will not deprive the court of subject-matter jurisdiction," a person must be joined if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or

> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

>> (i) as a practical matter impair or impede the person's ability to protect the interest; or

17

> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). "Determining whether an entity is a required party under Rule 19(a)(1) calls for practical judgments influenced greatly by the facts and circumstances of each particular case." *Pitman Farms v. Kuehl Poultry LLC*, No. 19-cv-3040 (ECT/BRT), 2020 WL 2490048, at *3 (D. Minn. May 14, 2020). "The focus of Rule 19(a)(1) is on relief between the parties and not on the speculative possibility of further litigation between a party and an absent person." *Cedar Rapids Bank & Trust Co. v. Mako One Corp.*, 919 F.3d 529, 534–35 (8th Cir. 2019), *cert. denied*, 140 S. Ct. 848 (2020) (cleaned up). "[T]he mere fact the underlying litigation will affect or otherwise impact a non-party's interests does not mean" that the requirements of Rule 19(a)(1)(B) have been met. *EEOC v. Cummins Power Generation, Inc.*, 313 F.R.D. 93, 102 (D. Minn. 2015). Rather, the "basic consideration when determining whether a non-party is indispensable is if the non-party's absence would render a judgment infirm, defective, or unfairly prejudicial in some fashion." *Id.* at 98. The remedy for failure to join a required party is not dismissal; it is an order that the party be joined. Fed. R. Civ. P. 19(a)(2) ("If a person has not been joined as required, the court must order that the person be made a party."); *see also Ranger Transp., Inc. v. Wal-Mart Stores*, 903 F.2d 1185, 1187 (8th Cir. 1990) ("[E]ven if Bell were a necessary party, the proper procedure under Rule 19(a) is to give the parties an opportunity to bring in such a party, not to dismiss the action.").

There is an overarching problem with the Armed Forces Office's Rule 12(b)(7) motion:  the Office does not seek an order making Medical Cost Advocate or MIM a party to this case.  The Armed Forces Office engages in a Rule 19(b) analysis, which only applies if the person who is required to be joined cannot be joined.  *See* Fed. R. Civ. P. 19(b) (setting forth factors to be considered if otherwise required party cannot be joined).  We are not told why either organization cannot be joined.  *See Ranger Transp.*, 903 F.2d at 1187 n.2 (citing Fed. R. Civ. P. 19(b)) ("An 'indispensable party' is a person who should be joined but *cannot* be joined for reasons such as venue or jurisdiction.").  The motion could be denied on just this basis.  Regardless, the better answer is that neither Medical Cost Advocate nor MIM is a required party under Rule 19(a).

Medical Cost Advocate is not a required party.  Although it signed the Preferred Rate Agreements on the Armed Forces Office's behalf, it did so only as the Office's agent. "Under general agency rules, an agent who makes a contract for a disclosed principal is not a party to the contract."  *Hanna Mining Co. v. Minn. Power & Light Co.*, 573 F. Supp. 1395, 1398 (D. Minn. 1983).  Although, as the Armed Forces Office points out, Fairview quotes Medical Cost Advocate's representative throughout its Complaint, including as the basis for its claim that the Armed Forces Office knew that the checks should be made payable to Fairview and sent to Ms. Ring's attention, this argument boils down to a contention that Medical Cost Advocate's representative should be a witness in the case.  It is difficult to understand how, in Medical Cost Advocate's absence, complete relief could not be afforded as between Fairview and the Armed Forces Office.

Whether MIM is a required party is a closer question, but the better answer is that it is not. As the Armed Forces Office points out, it paid all of the disputed amounts to MIM—and it has the checks to prove it. Fairview's Complaint assumes that MIM cashed these checks. Compl. ¶ 24. The Armed Forces Office argues that it will be subject to double liability if MIM is not joined as a party. MIM, however, is not a signatory to the Preferred Rate Agreements between the Armed Forces Office and Fairview, and "all of the rights and obligations arising under a [contract] can be adjudicated where all of the parties to the [contract] are before the court." *Helzberg's Diamond Shops, Inc. v. Valley W. Des Moines Shopping Ctr., Inc.*, 564 F.2d 816, 819 (8th Cir. 1977). Any danger that the Armed Forces Office might be subject to double liability may be mitigated through a cross claim against MIM or, if the Armed Forces Office is eventually ordered to pay Fairview, it brings a different lawsuit seeking recovery of the amounts paid to MIM. *See Ranger Transp.*, 903 F.2d at 1187. *Ranger Transport* is more akin to the facts here than the authority on which the Armed Forces Office relies. In *Ranger Transport*, Wal-Mart paid freight charges to Ranger Transport's agent, Bell Trucking. *Id.* Ranger Transport brought suit against Wal-Mart for the freight charges, and Wal-Mart moved to dismiss, contending that Bell was an indispensable party under Rule 19. *Id.* The Eighth Circuit affirmed the denial of Wal-Mart's motion, finding that Wal-Mart should have brought a cross-claim against Bell, a corporation within the venue and jurisdiction of the District Court, rather than seeking dismissal. *Id.*

*Cafesjian v. Armenian Assembly of America, Inc.*, on which the Armed Forces Office relies, does not compel a different conclusion. No. 07-cv-2079 (JNE/JJG), 2008

WL 906194 (D. Minn. Mar. 31, 2008) (R. & R. of Graham, M.J.).  There, a disgruntled donor sought to recoup millions of dollars he donated to several related organizations.  One of those organizations transferred the donor's money to an entity whose formation the donor had requested for that purpose.  *Id.* at *2.  The donor did not include this entity in his lawsuit for rescission of his donations.  Because the non-joined entity possessed the money the donor wanted returned, the Magistrate Judge determined that the entity was a required party: "[p]ersons or entities . . . that possess disputed fruits of a contract must be joined under Rule 19(a)."  *Id.* at *9.  Ultimately, the defendant's motion to dismiss under Rule 12(b)(7) was granted because the indispensable entity was not subject to the Court's personal jurisdiction and could not be joined.  *Id.* at *11.  If the Armed Forces Office sought to rescind from Fairview the payments it made to MIM—if, for example, the Office claimed that Fairview's medical care was sub-par and that it should not have been paid for that care, *Cafesjian* might be on point.  MIM would be a required party because it ostensibly holds the disputed funds.  But there is no rescission at issue, and this lawsuit can offer complete relief to both parties: Fairview can recover under the Preferred Rate Agreements and if it does so, the Armed Forces Office has a cause of action against MIM.  "The focus [of Rule 19(a)(1)] is on relief between the parties and not on the speculative possibility of further litigation between a party and an absent person."  *LLC Corp. v. Pension Benefit Guar. Corp.,* 703 F.2d 301, 305 (8th Cir. 1983).[9]

---

[9]  If MIM were a required party under Rule 19(a)(1), the burden would fall on the Armed Forces Office to show that MIM's joinder would not be feasible.  *See* 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil § 1359 (3d ed. 2004).  Though the Armed Forces Office has suggested that Fairview believes MIM is in

**ORDER**

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS**

**ORDERED THAT** Defendant's Motion to Dismiss [ECF No. 24] is **DENIED**.


Dated:  June 27, 2023                                  s/ Eric C. Tostrud
                                                       _____
                                                       Eric C. Tostrud
                                                       United States District Court

---

bankruptcy, the record includes no appropriate answer to this question.  The Armed Forces Office, in other words, has not carried its burden.