UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Fairview Health Services, *doing business as University of Minnesota Medical Center*,

        Plaintiff and Counter-Defendant,

v.

Armed Forces Office of the Royal Embassy of Saudi Arabia,

        Defendant, Counter-Plaintiff, and Third-Party Plaintiff,

v.

Medical Cost Advocate, Inc.; Global Medical Services, LLC; International Medical Center of Minnesota, LLC, *formerly doing business as Minnesota International Medicine*; Khemwattie Singh; and Sherif Saad,

        Third-Party Defendants.

File No. 21-cv-2666 (ECT/TNL)

**OPINION AND ORDER**

---

William Thomas Wheeler, Geoffrey Koslig, David P. Bunde, and Pari McGarraugh, Frederickson & Byron, Minneapolis, MN; and Jacob Patsch Harris, Office of the Minnesota Attorney General, St. Paul, MN, for Plaintiff Fairview Health Services.

Cormac Connor, George Edward Stewart, III, and Julia Anne Bonestroo Banegas, Husch Blackwell LLP, Washington, D.C.; and Aaron B. Chapin, Husch Blackwell LLP, Chicago, IL, for Defendant Armed Forces Office of the Royal Embassy of Saudi Arabia.

Charles E. Jones, Kelly C. Engebretson, Sara Filo, and Megan Renslow, Moss & Barnett, Minneapolis, MN, for Third-Party Defendant Medical Cost Advocate, Inc.

Karl J. Yeager, Meagher & Geer, PLLP, Minneapolis, MN, for Third-Party Defendant Sherif Saad.

Fairview Health Services provided treatment to two Saudi citizens in 2018 and 2019. The Armed Forces Office of the Royal Embassy of Saudi Arabia, the entity responsible for payment of those services, mailed over $1.3 million to Fairview but named the wrong payee on the checks. Fairview forwarded the checks to that payee, who took the funds. Fairview initiated this breach-of-contract suit against the Armed Forces Office in 2021 to recover payment.

The case is now in its third round of Rule 12 motions. The Armed Forces Office moved to dismiss Fairview's Complaint in March 2023, and its motion was denied. In August 2023, the Armed Forces Office asserted counterclaims against Fairview and claims against third parties. Those claims were dismissed without prejudice. In February 2024, the Armed Forces Office amended its answer and reasserted counterclaims and third-party claims. Now, Fairview and two third-party defendants, Medical Cost Advocate, Inc. and Sherif Saad, move to dismiss the claims against them. Fairview also moves to strike one of the Armed Forces Office's affirmative defenses.

Fairview's motions will be granted because the Armed Forces Office does not plausibly allege a breach, and its affirmative defense is not cognizable. Saad's motion will be denied because the Armed Forces Office sufficiently pleads his personal participation in the disappearance of the funds intended for Fairview. And MCA's motion will be granted in part and denied in part; the Armed Forces Office does not assert a plausible claim for breach of fiduciary duty, but its breach of contract and contribution claims survive.

2

I[1]

The facts underlying this iteration of the case are largely the same as the facts described in the December 7, 2023 Opinion and Order.  *See Fairview Health Servs. v. Armed Forces Off. of Royal Embassy of Saudi Arabia*, 705 F. Supp. 3d 898, 905–07 (D. Minn. 2023).  Still, an overview of the events leading to these motions is helpful.

The Armed Forces Office is part of the Kingdom of Saudi Arabia's embassy and diplomatic mission in the United States.  Am. Countercl. [ECF No. 131] ¶ 2.  It arranges healthcare for Saudi citizens who are otherwise unable to obtain particular care in Saudi Arabia.  *Id.* ¶ 3.  Fairview is a nonprofit healthcare corporation providing services in Minnesota, including to at least two Saudi citizens.  *Id.* ¶ 4; *see id.* ¶¶ 28–29.  The Armed Forces Office and Fairview did not interact directly, but through intermediaries—first through Minnesota International Medicine ("MIM"), then Medical Cost Advocate ("MCA").

Beginning in 2014, Fairview engaged MIM as an agent to "invoice and collect fees" for Fairview's services.  *Id.* ¶ 21 (quoting Ex. Y [ECF No. 133-1] § 3(c)).  The Armed Forces Office would contact MIM to coordinate healthcare services.  *Id.* ¶ 22.  MIM would

---

[1]     In reviewing a Rule 12(b)(6) motion, a court must accept as true all the factual allegations in the challenged pleading and draw all reasonable inferences in the plaintiffs' favor.  *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted).  In accordance with these rules, the background facts are taken from the Amended Counterclaims and Third-Party Claims [ECF No. 131] filed by the Armed Forces Office, and documents necessarily embraced by that pleading.  *See Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017).

send invoices to the Armed Forces Office, and the Armed Forces Office paid MIM.  *Id.* ¶¶ 22–23.

Beginning in March 2018, the Armed Forces Office retained MCA as an agent to provide medical bill review services and to assist with prospective and retrospective price negotiations.  *Id.* ¶ 39.  Under their agreement, if MCA negotiated a rate reduction, it would present the Armed Forces Office with a "Preferred Rate Agreement" to memorialize the negotiated terms.  *Id.* ¶ 39(e).  The Armed Forces Office and MCA agreed to hold each other's confidential information in "strict confidence."  *Id.* ¶ 39(f)–(g).

The remaining third-party defendants are Global Medical Services ("GMS"), Khemwattie Singh, and Dr. Sherif Saad.  GMS acquired MIM around June 2018.  *Id.* ¶ 6; Ex. X [ECF No. 132-3] ¶ 1(c).  Singh was the chief executive officer of MIM and GMS.  Am. Countercl. ¶ 8; Ex. T [ECF No. 132-3].  Saad was the chief business development officer of MIM and GMS, and the former chief executive officer of MIM.  Am. Countercl. ¶ 9; Ex. T.

Through MIM, the Armed Forces Office arranged healthcare services for two Saudi children, R.A. and L.A., in 2017.  Am. Countercl. ¶¶ 28–29.  Fairview provided medical care for the children.  *Id.* ¶ 30.  The treatment ultimately generated $1,301,272.95 in negotiated charges.  *Id.* ¶ 92.  Those charges were presented to the Armed Forces Office in fourteen invoices from MIM.  *Id.* ¶ 24; *see* Exs. A–P [ECF Nos. 132-1 to -2].

MCA, on behalf of the Armed Forces Office, began negotiating with Fairview regarding these invoices in mid-2019.  *Id.* ¶ 49.  On June 20, 2019, MCA and the Armed Forces Office entered into sixteen Preferred Rate Agreements for the fourteen invoices.  *Id.*

¶ 61; Exs. A–P.[2]   The Preferred Rate Agreements identified Fairview as the party that "agrees to accept" payment.  *See, e.g.*, Ex. A.[3]  Before the Armed Forces Office paid for R.A. and L.A.'s care, MCA provided the Armed Forces Office with these instructions:

> When making payment agreements for Minnesota Medicine please send checks to the following address AND iNCLUDE [sic] Attention Maureen Ring:
>
> Fairview Health Services
> Attention: Maureen Ring
> 400 Stinson Boulevard
> Minneapolis MN 55413

Am. Countercl. ¶ 88.  The Armed Forces Office made the checks payable to MIM, as it had done before.  *Id.* ¶ 87.

An Armed Forces Office representative spoke with an MCA employee by phone on September 4, 2019.  *Id.* ¶ 91.  During the call, the Armed Forces Office told MCA that it had made the checks payable to MIM and "asked if this was correct or if the Checks should be reissued."  *Id.*  The MCA employee "advised the [Armed Forces Office] to proceed and to send the Checks to Fairview, without altering the payee information."  *Id.*

That same day, the Armed Forces Office sent sixteen checks—made payable to MIM and totaling more than $1.3 million—via overnight mail to Fairview's Stinson

---

[2]   There are sixteen Preferred Rate Agreements for fourteen invoices because, the Armed Forces Office alleges, MCA entered into three agreements for one invoice (invoice no. 6023).  Am. Countercl. ¶ 199; *see* Exs. K–M [ECF No. 132-2].

[3]   Each Preferred Rate Agreement states, "Fairview Health Services agrees to accept a flat rate of [amount]" save one.  Instead of "Fairview Health Services," one Agreement reads, "Minnesota Medicine - Fairview Hosp agrees to accept a flat rate . . . ."  Ex. E [ECF No. 132-1].

Avenue address. *Id.* ¶¶ 92–93; *see* Exs. A–P (checks); Ex. Q [ECF No. 132-2] (proof of delivery). The mailing did not include "attention Maureen Ring." Am. Countercl. ¶ 93. Fairview received the checks on September 5. *Id.* ¶ 94; Ex. Q. After receiving the checks, Fairview forwarded them to MIM. Am. Countercl. ¶ 95.

On September 16, Fairview contacted MCA claiming it had not received payment for the services rendered to R.A. and L.A. *Id.* ¶ 99. The Armed Forces Office and MCA investigated and obtained copies of the canceled checks. *Id.* ¶¶ 100–03. The Armed Forces Office alleges it paid MCA roughly $7,875.00 for its services in trying to locate the checks. *Id.* ¶ 102.

Bridgewater Bank records show that $1,301,272.85[4] was deposited to MIM's account on September 10, 2019. *Id.* ¶ 115; Ex. Z [ECF No. 132-5]. The next day, $500,000 was transferred out of the account in two transactions. Ex. Z. Within ten days of depositing the funds, all $1.3 million was transferred out of the account in large transactions. *Id.* Three of the transfers—for $200,000 on September 11, for $300,000 the same day, and for $500,000 on September 13—were done "per Kim." *Id.* The parties do not say who "Kim" is, but the exhibits show third-party defendant Khemwattie Singh, MIM's CEO, went by "Kim" Singh, *see* Ex. T, and that Singh was listed on the bank account, *see* Ex. Z.[5]

---

[4]   It doesn't matter for these motions, but there is a ten-cent discrepancy between what the Armed Forces Office alleges it paid and what MIM deposited. The Armed Forces Office alleges $1,301,272.**95** was mailed. *See, e.g.*, Am. Compl. ¶¶ 92, 186, 188, 191. The deposit was for $1,301,272.**85**. Ex. Z.

[5]   Singh was indicted on federal wire-fraud charges in 2022. Am. Countercl. ¶ 113; Ex. X. She pleaded guilty in December 2023 to two counts of wire fraud and willful failure to account for and pay over payroll taxes. *See United States v. Singh*, No. 22-cr-308(1)

Along with Singh, MIM and GMS are named on the Bridgewater Bank account. Am. Countercl. ¶ 115; Ex. Z.  Saad is not.  *See* Ex. Z.  The Armed Forces Office alleges that the transferred funds went to six other Bridgewater Bank accounts controlled by Singh, GMS, or GMS personnel.  Am. Countercl. ¶ 119.  It alleges the funds were "transferred again to other domestic or foreign accounts, transferred to third parties, and were used to pay for Singh and others to travel overseas." *Id.* ¶ 121.

Sherif Saad—chief business development officer of MIM and GMS—emailed the Armed Forces Office on the day of the deposit (September 10), inquiring about the status of payment. *Id.* ¶ 97.  Two days later, Saad emailed the Armed Forces Office to confirm "the hospital" received the checks, without specifying what "the hospital" meant.  *Id.* ¶ 98. The Armed Forces Office understood Saad's message to mean the invoices had been paid. *Id.*

Fairview sued the Armed Forces Office in December 2021, claiming it has not been paid for the medical services it provided to R.A. and L.A., and asserting claims for breach of contract, quantum meruit, and breach of the implied covenant of good faith and fair dealing.  Compl. [ECF No. 1] ¶¶ 26–39.  In March 2023,[6] the Armed Forces Office moved to dismiss Fairview's claims for lack of subject-matter jurisdiction, failure to state a claim upon which relief may be granted, and failure to join MIM and MCA as necessary parties.

---

(PJS/JFD) at ECF No. 106.  In July 2024, Singh was sentenced to a 27-month imprisonment term.  *Id.* at ECF No. 145.

[6]    Due to delays in effecting service, the Armed Forces Office did not enter an appearance until February 2023.  ECF Nos. 16–18.

ECF Nos. 24–28.  The motion was denied.  *See Fairview Health Servs. v. Armed Forces Off. of the Royal Embassy of Saudi Arabia*, 679 F. Supp. 3d 811, at 825 (D. Minn. 2023). The Armed Forces Office subsequently filed a responsive pleading that included counterclaims and third-party claims.  ECF No. 42.  In September 2023, Fairview and MCA moved to dismiss the claims against them, ECF Nos. 56, 60, and the motions were granted without prejudice to permit the Armed Forces Office the opportunity to seek leave to amend, *see Fairview Health Servs.*, 705 F. Supp. 3d at 918.  The Armed Forces Office subsequently sought leave to amend, and Magistrate Judge Leung granted the motion.  ECF No. 129.

The Armed Forces Office has now filed an Amended Answer, ECF No. 130, and again asserts counterclaims and third-party claims, ECF No. 131.  The Armed Forces Office brings two counterclaims against Fairview: breach of contract and breach of the implied covenant of good faith and fair dealing.  *Id.* ¶¶ 128–51.  It brings one claim against MIM and GMS for breach of implied contract.  *Id.* ¶¶ 152–64.  Two claims are asserted against MIM, GMS, Singh, and Saad: unjust enrichment/quantum meruit and conversion. *Id.* ¶¶ 165–92.  Lastly, the Armed Forces Office brings three claims against MCA for breach of contract, breach of fiduciary duty, and contribution.  *Id.* ¶¶ 193–238.  Fairview, MCA, and Saad separately move to dismiss each claim against them.  ECF Nos. 146, 148, 166.  Fairview also moves to strike one of the Armed Forces Office's affirmative defenses: comparative fault.  ECF No. 153.

II

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.*

III

A

The Armed Forces Office's first claim is against Fairview for breach of contract. It alleges Fairview breached the Preferred Rate Agreements essentially by forwarding the checks to MIM, and that it was damaged by losing the $1.3 million payments and by paying MCA to search for the checks. Am. Countercl. ¶ 143. Fairview argues the Armed Forces Office has failed to plausibly allege a breach. *See* ECF No. 149 at 9–11. Fairview is right: the Armed Forces Office has not pleaded facts plausibly showing Fairview breached any duty under the Preferred Rate Agreements.

Under Minnesota law, a breach-of-contract claim requires: "(1) a valid contract; (2) performance by the plaintiff of any conditions precedent; (3) a material breach of the contract by the defendant; and (4) damages." *Russo v. NCS Pearson, Inc.*, 462 F. Supp. 2d 981, 989 (D. Minn. 2006) (citation omitted); *see Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011) (same). Fairview disputes the third and fourth elements, arguing the Armed Forces Office has not plausibly alleged Fairview breached the contracts or that the Armed Forces Office suffered damages caused by any breach. ECF No. 149 at 10–17.

The Armed Forces Office alleges Fairview breached the Preferred Rate Agreements by (a) failing to alert the Armed Forces Office that the checks had been made payable to MIM, (b) failing to prevent the checks from being delivered to MIM, and (c) failing to treat the debt as having been paid after initially receiving the checks. Am. Countercl. ¶ 143. Fairview argues that none of the alleged breaches stems from any duty defined in the Preferred Rate Agreements. ECF No. 149 at 10–11. The Armed Forces Office responds that each duty Fairview is alleged to have breached is contained in the plain language of the Preferred Rate Agreements. ECF No. 165 at 9–13.

A careful review of the Preferred Rate Agreements shows Fairview has the better argument. Each Preferred Rate Agreement is just one page and contains identical language, save specific details like the invoice number and payment amount. *See* Exs. A–P. The text of each Preferred Rate Agreement is as follows:

> This Preferred Rate Agreement constitutes the full understanding between **Fairview Health Services** and Medical Cost Advocate, Inc. (acting as an agent on behalf of

10

Armed Forces Office of the Royal Embassy of Saudi Arabia) regarding the above-referenced patient and service dates. **Fairview Health Services** agrees to accept a flat rate of $[**amount**] for services rendered. The agreed upon amount is the full amount due to the Facility or Healthcare Professional. Provider shall not attempt to collect any additional monies from the patient. Provider shall not file arbitration or suit with regards to this bill.

. . .

This agreement and any requested forms should be returned by fax to **(866) 773-0887** or via email to **atodd@medicalcostadvocate.com**, attention Annemarie Todd.

Please contact Annemarie Todd at **(201) 674-0366** with any questions or concerns regarding this agreement.

## <u>Accepted and Agreed</u>

Ex. A. Each also contains a header with a date, account number, and specific details, and two signature lines: one for Annemarie Todd on behalf of MCA and one for Fairview. *See, e.g.*, *id.*

(1) The Armed Forces Office claims Fairview breached the Preferred Rate Agreements first "by failing to[] alert the [Armed Forces Office] that the Checks delivered to Fairview had been made payable to MIM and that Fairview deemed this to be inconsistent with the [Preferred Rate Agreements]." Am. Countercl. ¶ 143; *see also* ECF No. 165 at 9. According to the Armed Forces Office, this duty to alert arises from the sentence, "Please contact Annemarie Todd . . . with any questions or concerns regarding this agreement." ECF No. 165 at 9–10. The Armed Forces Office offers no legal support for that contention, *id.*, and none is apparent. The sentence is informational, set off from substantive paragraph of the agreements, and would not ordinarily create any duty on

11

Fairview's part.  As Fairview points out, it never agreed to alert the Armed Forces Office of its own mistake.  ECF No. 181 at 4; *see Watkins Inc. v. Chilkoot Distrib., Inc.*, 719 F.3d 987, 992 (8th Cir. 2013) (affirming summary judgment on a breach-of-contract claim where "Appellants have presented no law from the state of Minnesota, or any other authority, that persuades us they possess a cause of action for breach where, as here, the agreements are completely silent as to [the issue]").  And if the "questions or concerns" sentence created any duty, that duty was not plausibly breached because Fairview did not have any questions or concerns.  ECF No. 181 at 5.  The Armed Forces Office's first breach theory fails.

(2) The second breach the Armed Forces Office alleges is Fairview's failure to "prevent the Checks from being delivered to MIM, a party that was not the intended recipient of the Checks."  Am. Countercl. ¶ 143; *see also* ECF No. 165 at 10.  This duty, the Armed Forces Office argues, arises from three sources: the "questions or concerns" sentence described above, Fairview's delivery instructions, and the clause that "Fairview Health Services agrees to accept a flat rate of $[amount] for services rendered."  ECF No. 165 at 10.  Again, the Armed Forces Office cites no legal authority for its arguments.  And again, these claims fall short of showing a breach of any duty.  The "questions or concerns" sentence does not plausibly allege any duty, as described above.  The delivery instructions provided to the Armed Forces Office later (instructing it to send the checks to Fairview, "Attention Maureen Ring") were neither part of the "plain language" of the Preferred Rate Agreements, *see, e.g.*, Ex. A, nor complied with by the Armed Forces Office, *see* Am. Countercl. ¶ 93 ("The mailing address was the same as shown in Ex. S but did not include

12

the specific 'attention' to Maureen Ring."); *see also Russo*, 462 F. Supp. 2d at 989 (listing performance of any conditions precedent as a breach-of-contract claim requirement under Minnesota law).  Lastly, the clause stating, "Fairview agrees to accept a flat rate" did not create any duty for Fairview to accept checks *payable to MIM*, or anyone besides itself. As Fairview points out, it would not have been able to cash or deposit a check that was not made payable to it.  ECF No. 181 at 6–7.  The Armed Forces Office does not plausibly allege a breach under its second theory.

(3) Third, the Armed Forces Office claims Fairview breached the Preferred Rate Agreements by failing to "treat the [Armed Forces Office's] debt to Fairview as having been paid, once Fairview's agent accepted payment from the [Armed Forces Office] for a debt owed to Fairview."  Am. Countercl. ¶ 143; *see also* ECF No. 165 at 11.  The Armed Forces Office claims the duty to treat the debt as paid arises from the "Fairview agrees to accept a flat rate" sentence in the Preferred Rate Agreements.  ECF No. 165 at 11.  It argues that "[o]nce Fairview chose to forward the . . . checks to Fairview's billing agent, Fairview also should have deemed the payment as having been accepted."  *Id.*  But again, Fairview could not "accept" checks that listed a payee other than Fairview.  The Armed Forces Office's third theory fails.

The facts the Armed Forces Office presents in its Amended Counterclaims, taken as true, fail to plausibly show Fairview breached the Preferred Rate Agreements. Fairview's motion to dismiss will be granted as to Claim 1.

B

The Armed Forces Office's second claim is that Fairview breached the implied covenant of good faith and fair dealing by failing to accept payment, failing to alert the Armed Forces Office to any concerns about the payee, and failing to acknowledge that it had received the checks and forwarded them to MIM.  Am. Countercl. ¶ 149.  Fairview primarily argues the Armed Forces Office has not sufficiently alleged it acted in bad faith.  ECF No. 149 at 17–19.  Again, Fairview has the better argument.  The Armed Forces Office has not plausibly alleged facts tending to show Fairview acted in bad faith.

"Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not 'unjustifiably hinder' the other party's performance of the contract."  *In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995) (quoting *Zobel & Dahl Constr. v. Crotty*, 356 N.W.2d 42, 45 (Minn. 1984)); *see also* Restatement (Second) of Contracts § 205 (Am. L. Inst. June 2024 Update).  The duty "governs the parties' performance and prohibits a party from failing to perform for the purpose of thwarting the other party's rights under the contract." *Team Nursing Servs., Inc. v. Evangelical Lutheran Good Samaritan Soc'y*, 433 F.3d 637, 641–42 (8th Cir. 2006).  "[A] plaintiff alleging a claim for breach of the implied covenant of good faith and fair dealing 'need not first establish an express breach of contract claim— indeed, a claim for breach of an implied covenant of good faith and fair dealing implicitly assumes the parties did not expressly articulate the covenant allegedly breached.'"  *Cox v. Mortg. Elec. Registration Sys., Inc.*, 685 F.3d 663, 670 (8th Cir. 2012) (quoting *Hennepin Cnty.*, 540 N.W.2d at 503).  "Minnesota courts generally look to the defendant's motive to

determine whether the defendant has breached the implied covenant of good faith and fair dealing." *BP Prods. N. Am., Inc. v. Twin Cities Stores, Inc.*, 534 F. Supp. 2d 959, 966 (D. Minn. 2007).

Whether a party has acted in bad faith is generally a question of fact reserved for the fact-finder, *see Anderson v. Medtronic, Inc.*, 382 N.W.2d 512, 515 (Minn. 1986), but that does not relieve a plaintiff of the burden to allege facts plausibly showing bad faith, *see Miles v. Simmons Univ.*, 514 F. Supp. 3d 1070, 1075 (D. Minn. 2021) ("A rule excluding fact questions from consideration on a Rule 12(b)(6) motion to dismiss would not faithfully reflect federal pleading standards."). Examples of the type of conduct that may constitute bad faith include:

> wrongfully repudiating a contract, avoid[ing] performance by affirmatively blocking the happening of a condition precedent, refusing to allow a party to perform unless the performing party waived other contractual rights, and using a party's rejection of an offer as a defense to contract liability when the defendant persuaded the party to reject the offer in the first place.

*Cox*, 685 F.3d at 671 (internal quotation marks and citations omitted).

The Armed Forces Office has not plausibly alleged that Fairview acted in bad faith. The Armed Forces Office does not allege any of the types of conduct that *Cox* contemplates may constitute bad faith: it does not claim Fairview avoided performance, repudiated the contract, or refused to allow the Armed Forces Office to perform, for example. Though the Armed Forces Office alleges Fairview's bad faith "denied the [Armed Forces Office] the full benefit of its bargain," Am. Countercl. ¶ 150, it received exactly what it bargained for: medical treatment for L.A. and R.A., *see id.* ¶¶ 28–29. Moreover, the Armed Forces

Office alleges no ulterior, bad-faith motive for Fairview to have forwarded the checks to MIM. Fairview clearly wants to be paid for the services it rendered, and there is no plausibly alleged motive for Fairview to maliciously forward checks intended for it to another entity, when the checks were made payable to that entity. Fairview's motion to dismiss Count 2 will be granted.

C

In its fourth claim,[7] the Armed Forces Office alleges MIM, GMS, Singh, and Saad were unjustly enriched when they wrongfully retained the $1.3 million payment intended for Fairview. *See* Am. Countercl. ¶¶ 178–181. Only Saad moves to dismiss, arguing the Armed Forces Office hasn't met its pleading burden. ECF No. 167 at 6. But here, the Armed Forces Office has alleged facts sufficient to state a plausible unjust enrichment claim against Saad.

To state an unjust enrichment claim, the Armed Forces Office must allege Saad "has knowingly received or obtained something of value for which [he] in equity and good conscience should pay." *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 306 (Minn. 1996) (internal quotation marks omitted); *see Dahl v. R.J. Reynolds Tobacco Co.*, 742 N.W.2d 186, 195–96 (Minn. Ct. App. 2007). As an equitable remedy, unjust enrichment "does not apply when there is an enforceable contract" governing the parties' relationship. *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012); *see U.S. Fire Ins. Co. v. Minn. State Zoological Bd.*, 307 N.W.2d 490, 497

---

[7]     No party has moved to dismiss the Armed Forces Office's third claim: breach of implied contract against MIM and GMS, Am. Countercl. ¶¶ 152–64.

(Minn. 1981).  Unjust enrichment "rest[s] on notions of justice and fairness rather than on any actual agreement between the parties."  *O'Brien & Wolf, LLP v. S. Cent. Minn. Elec. Workers' Fam. Health Plan*, 923 N.W.2d 310, 316 (Minn. Ct. App. 2018).

The Armed Forces Office pleads a plausible unjust enrichment claim against Saad. It alleges Saad was "actively involved in and knowledgeable of the transactions" at Bridgewater Bank, Am. Countercl. ¶ 112; that Saad was the chief business development officer of MIM and GMS, *id.* ¶ 9; that, before GMS acquired MIM, Saad was the CEO of MIM, *id.*; that "Singh, Saad, GMS, and MIM knew that the checks comprising the Total PRA Payment were not intended for them" and nonetheless did not return them, *id.* ¶ 125; and that "MIM, GMS, Singh and/or Saad deliberately and fraudulently retained or spent the entire . . . amount," *id.* ¶ 173.

Saad's arguments in support of dismissal are not persuasive.  He argues that the allegations are "scant and unavailing," and that they indicate Singh—not Saad—had control of the funds.  ECF No. 167 at 6.  Saad has a point: the claims are more specific with respect to Singh.  *See* Am. Countercl. ¶¶ 113–21 (alleging Singh was named on the Bridgewater Bank account, that the funds were used to pay for Singh's travel, and that Singh pleaded guilty to wire fraud in connection with her role at MIM and GMS).  Still, the claims against Saad are supported with sufficient facts to survive a Rule 12(b)(6) motion.  Along with the facts already referenced, the Armed Forces Office plausibly alleges Saad—in his role as CEO of MIM—executed the agreements between Fairview and MIM, that he knew of the transactions at issue, and even reached out to Armed Forces Office asking about the status of the Armed Forces Office's payments on the invoices.  *Id.* ¶¶ 20,

97, 112.  After MIM received and deposited the checks, Saad was the one who informed the Armed Forces Office "that **the hospital** received the checks," causing the Armed Forces Office to believe the invoices had been properly paid.  *Id.* ¶ 98.  The Armed Forces Office has sufficiently alleged that Saad knowingly received something of value to which he was not entitled.

Saad's argument against "shareholder liability" is also unavailing.  *See* ECF No. 185 at 2–4.  To begin with, the argument was first raised in Saad's reply brief.  Arguments raised for the first time in a reply brief are not usually entertained.  *RedKing Foods LLC v. Minn Assocs. LP*, No. 13-cv-0002 (PJS/JSM), 2014 WL 754686, at *4 (D. Minn. Feb. 26, 2014); *see also* D. Minn. LR 7.1(c)(3)(B) ("A reply memorandum must not raise new grounds for relief or present matters that do not relate to the opposing party's response.").  More fundamentally, the Armed Forces Office does not assert Saad is liable in his capacity as a shareholder of MIM or GMS.  To the contrary, the Armed Forces Office specifically alleges Saad is liable in his personal capacity because he personally had knowledge of the funds and caused them to be retained.  *See* Am. Countercl. ¶¶ 112, 172–79.  Saad's argument appears to spring from the Armed Forces Office's reliance on *C.H. Robinson Worldwide, Inc. v. U.S. Sand, LLC*, No. 13-cv-1274 (JRT/FLN), 2014 WL 67957 (D. Minn. Jan. 8, 2014).  *See* ECF No. 180 at 6–7.  In *C.H. Robinson*, the plaintiff sued a corporation, its CEO, and its owner for unjust enrichment, among other claims.  *C.H. Robinson*, 2014 WL 67957, at *1.  But there, unlike here, the plaintiff alleged the individual defendants (the CEO and the owner) "'used U.S. Sand's corporate entity as a mere shell to secure valuable services from C.H. Robinson and then diverted the proceeds from those services

to their own personal use,' and 'exercised such control over U.S. Sand such that it was their alter ego.'"  *Id.* at \*2.  The Armed Forces Office relies on *C.H. Robinson* for the unremarkable conclusions that a court may deny a motion to dismiss an unjust enrichment/quantum meruit claim when the claimant alleged sufficient facts to state a plausible claim, and that it would be "unjust" or "morally wrong" to allow the defendant to retain profits derived from plaintiff's services without paying for the services.  ECF No. 180 at 6–7 (quoting *C.H. Robinson*, 2014 WL 67957, at \*6).  Notably, the Armed Forces Office does *not* claim Saad used MIM or GMS as a shell or alter ego in its pleadings or briefing.  In other words, Saad is not being sued because he is or was a shareholder of MIM and GMS; he is being sued because he is alleged to have personally exploited the funds. There is no veil-piecing problem here.[8]  It is difficult to understand why an unjust enrichment claim could not be asserted against an individual when the complainant plausibly alleges the individual's personal involvement.  Saad's motion to dismiss will be denied as to Claim 4.

---

[8]     If the Armed Forces Office intended to allege shareholder liability, the claim would still survive.  In *C.H. Robinson*, the court found that the complaint's allegations, "[]though sparse," were enough to survive a motion to dismiss.  *C.H. Robinson*, 2014 WL 67957, at \*9.  The same is true here.  The Amended Counterclaims allege Saad failed to observe corporate formalities to enrich himself, Am. Countercl. ¶ 123, which is one of the *Victoria Elevator* factors used to determine when a shareholder can be liable for corporate obligations.  *Id.* at \*8 (citing *Victoria Elevator Co. of Minneapolis v. Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn. 1979)).  "At the pleading stage, courts in this district have permitted claims against individual corporate defendants to proceed when plaintiffs make basic allegations as to one or more of these factors."  *Id.*

D

In its fifth cause of action, the Armed Forces Office asserts a conversion claim against MIM, GMS, Singh, and Saad.  Am. Countercl. ¶¶ 182–92.  Again, Saad is the only third-party defendant moving to dismiss.  ECF No. 167.  Saad argues the claim is not plausibly alleged and that a check cannot support a conversion claim because it is intangible.  *Id.* at 7; ECF No. 185 at 4–6.  These arguments are not persuasive.

"The elements of common law conversion are (1) the plaintiff has a property interest and (2) the defendant deprives the plaintiff of that interest."  *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 986 (8th Cir. 2008) (quoting *Olson v. Moorhead Country Club*, 568 N.W.2d 871, 872 (Minn. Ct. App. 1997)); *see DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn. 1997) (defining conversion "as an act of willful interference with personal property, 'done without lawful justification by which any person entitled thereto is deprived of use and possession'" (quoting *Larson v. Archer-Daniels-Midland Co.*, 32 N.W.2d 649, 650 (Minn. 1948))).

Saad's primary argument is short and simple: the Armed Forces Office failed to allege Saad received any funds and failed to plead any facts to show that Saad deprived the Armed Forces Office of any funds.  ECF No. 167 at 7.  Not so.  The Armed Forces Office alleged Saad's personal involvement in receiving the funds with some particularity.  *See* Am. Countercl. ¶¶ 97, 98, 112 (pleading Saad knew about the transactions, reached out to the Armed Forces Office regarding the status of payments, and sent an email stating the checks had been received).

20

In Saad's reply brief, he argues (for the first time) that the conversion claim cannot withstand a 12(b)(6) motion because checks are intangible property. *See* ECF No. 185 at 4–6. The Minnesota Court of Appeals has said that "a conversion claim is viable with respect to money only if the money is in a tangible form (such as a particular roll of coins or a particular stack of bills) and is kept separate from other money." *TCI Bus. Cap., Inc. v. Five Star Am. Die Casting, LLC*, 890 N.W.2d 423, 429 (Minn. Ct. App. 2017); *see Streambend Props. II, LLC v. Ivy Tower Minneapolis LLC*, No. A18-1488, 2019 WL 2332409, at *8 (Minn. Ct. App. June 3, 2019). The *TCI Business Capital* court reached this conclusion for three reasons: (1) the Minnesota Supreme Court has typically defined property as goods and all of its prior opinions regarding conversion concerned tangible personal property, *i.e.*, "items that can be seen and touched"; (2) the conclusion was consistent with the Minnesota Court of Appeals' only precedential opinion to address the issue expressly; and (3) the conclusion also was "consistent with the traditional common-law rule that an electronic financial transaction cannot be the basis of a conversion claim." *TCI Bus. Cap., Inc.*, 890 N.W. 2d at 428–29. This jibes with the Eighth Circuit's long-held understanding that Minnesota conversion law follows "the general rule . . . that the cause of action only applies to tangible property, or intangible property customarily merged in, or identified with, some document." *H.J., Inc. v. Int'l Tel. & Tel. Corp.*, 867 F.2d 1531, 1547 (8th Cir. 1989) (citations omitted); *see Advanced Control Tech., Inc. v. Iversen*, No. 19-cv-1608 (DSD/TNL), 2021 WL 2646858, at *5 (D. Minn. Apr. 8, 2021) (same).

Saad's intangibility argument fails. First, the argument was raised for the first time in reply. *RedKing Foods LLC*, 2014 WL 754686, at *4; D. Minn. LR 7.1(c)(3)(B). Second,

even if the argument is entertained, a stack of sixteen checks is not the type of "intangible" property Minnesota law contemplates as not qualifying for a conversion claim.  Unlike, for example, electronic funds, checks are "items that can be seen and touched."  *TCI Bus. Cap., Inc.*, 890 N.W.2d at 429.  And a check is considered intangible property "merged in, or identified with, some document," such that it may be considered tangible.  *H.J., Inc.*, 867 F.2d at 1547;  *see CyberOptics Corp. v. Yamaha Motor Co.*, No. 3-95-1174, 1996 WL 673161, at *25 (D. Minn. July 29, 1996) ("Under the traditional rule, conversion may apply to . . . documents in which intangible rights are merged, such as promissory notes, *bank checks*, bonds, and bills of lading . . . ." (emphasis added)).  A few examples of intangible property—not subject to a conversion claim—are instructive.  Trade secrets, proprietary information, intellectual property, and digital copies of photographs have been found intangible by courts applying Minnesota law.  *See Advanced Control Tech., Inc.*, 2021 WL 2646858, at *5 (trade secrets and proprietary information); *Beaulieu v. Stockwell*, 46 F.4th 871, 876 (8th Cir. 2022) (intellectual property and digital copies of photos).  A physical check—or sixteen of them—designating specific amounts to be paid is qualitatively different from the sorts of property usually considered intangible.

As part of his intangibility argument, Saad asserts that the Armed Forces Office's conversion claim fails because it did not hold a property interest in the checks under Minnesota conversion law.  ECF No. 185 at 6.  The Armed Forces Office has sufficiently pleaded it had a property interest in the checks.  *See* Am. Countercl. ¶ 189 ("The [Armed Forces Office] is being unlawfully deprived of its property as a result of MIM's, GMS', Singh's, and Saad's misconduct . . . ."); *see also FCA Constr. Co. v. Singles Roofing Co.*,

No. 09-cv-3700 (ADM/AJB), 2011 WL 5275852, at *2 (D. Minn. Nov. 3, 2011) (denying a motion to dismiss a conversion claim when the plaintiff "has alleged that it held a property interest in the money at issue and was wrongfully deprived of its property interest in that money by [defendant's] misappropriation of it"). Saad's motion to dismiss will be denied as to Claim 5.

E

The Armed Forces Office and MCA entered into an agreement in which MCA would negotiate invoices with Fairview on the Armed Forces Office's behalf. *See* Ex. R [ECF No. 132-2]. The Armed Forces Office alleges MCA breached the agreement by negotiating a *higher* invoice payment for one of the fourteen invoices. The Armed Forces Office alleges that invoice 6023 (Exs. K–M) was originally for $216,971.50, and after MCA negotiated on its behalf, the Armed Forces Office paid $258,154.76—roughly $41,000 more than Fairview charged. Am. Countercl. ¶¶ 78–81. MCA argues that release and indemnity clauses within the contract bar the claim. *See* ECF No. 147 at 11. But it is plausible these clauses may be unenforceable, and the Armed Forces Office plausibly alleges a breach.

Under Minnesota law,[9] a breach-of-contract claim requires: "(1) a valid contract; (2) performance by the plaintiff of any conditions precedent; (3) a material breach of the

---

[9]    In the last round of Rule 12 motions, there was some dispute about which state's law applied to the Armed Forces Office's third-party claims against MCA. *See Fairview Health Servs.*, 705 F. Supp. 3d at 913 n.4. Now, all parties seem to agree that Minnesota law governs each of the Armed Forces Office's claims. *See* ECF Nos. 147, 149, 165, 167, 171, 180 (each relying exclusively on Minnesota law).

contract by the defendant; and (4) damages." *Russo v. NCS Pearson, Inc.*, 462 F. Supp. 2d 981, 989 (D. Minn. 2006) (citation omitted).  MCA does not argue that the Armed Forces Office failed to plausibly allege any element of a breach-of-contract claim.  *See* ECF No. 147.  It argues the claim is barred by the very contract at issue.  *Id.* at 12–20.  This claim, then, will turn on whether the exculpatory clause in the contract is enforceable and covers the conduct at issue.

The agreement between MCA and the Armed Forces Office includes four provisions that MCA thinks are relevant to the Armed Forces Office's three claims against it: (1) a term providing that the Armed Forces Office "understands and agrees that it will be its obligation to pay the Patient's health care provider"; (2) a term specifying both parties agree the Armed Forces Office is solely responsible for bill payment; (3) an exculpatory clause, entitled "Release," providing the Armed Forces Office agrees to release MCA "from any and all claims . . . arising out of the performance of the MCA of the services contemplated" by the agreement; and (4) and indemnity clause providing the Armed Forces Office will indemnify and hold MCA harmless against the same.  ECF No. 147 at 13–14 (quoting Ex. R §§ 2.3, 2.4, 6.1, 6.2).  The clauses that MCA argues would preclude the breach-of-contract claim here are the exculpatory clause and the indemnity clause.

Under Minnesota law, both exculpatory clauses and indemnity clauses are disfavored.  "[E]xculpatory clauses are disfavored and will not be enforced if the clause 'purports to release the benefitted party from liability for intentional, willful or wanton acts.'" *Gage v. HSM Elec. Prot. Servs., Inc.*, 655 F.3d 821, 825 (8th Cir. 2011) (quoting *Schlobohm v. Spa Petite, Inc.*, 326 N.W.2d 920, 923 (Minn. 1982)); *see also Just. v.*

*Marvel, LLC*, 979 N.W.2d 894, 901 (Minn. 2022) ("We have previously recognized that both types of provisions are disfavored in the law.").  The Minnesota Supreme Court has said that "exculpatory clauses do not violate public policy when applied to claims of ordinary negligence, but do violate public policy, and are therefore unenforceable, against claims of 'willful and wanton negligence.'"  *Gage*, 655 F.3d at 825 (quoting *Morgan Co. v. Minn. Mining & Mfg.*, 246 N.W.2d 443, 448 (Minn. 1976)).  "But whether an exculpatory clause is enforceable is a fact-based question that usually cannot be resolved on a Rule 12 motion."  *Untiedt's Vegetable Farm, Inc. v. S. Impact, LLC*, 493 F. Supp. 3d 764, 766 (D. Minn. 2020) (citing *Schlobohm v. Spa Petite, Inc.*, 326 N.W.2d 920, 923–26 (Minn. 1982)).

MCA primarily argues exculpatory and indemnity clauses are enforceable where, as here, they do not attempt to eliminate liability for willful and wanton negligence.  ECF No. 147 at 14–15; *see* Ex. R §§ 6.1, 6.2 (excepting gross negligence and intentional misconduct from each clause).  But although Minnesota courts "may uphold the enforceability of a contractual indemnity clause, [they] disfavor agreements 'seeking to indemnify the indemnitee for losses occasioned by its *own* negligence.'"  *Dewitt v. London Rd. Rental Ctr., Inc.*, 910 N.W.2d 412, 416 (Minn. 2018) (quoting *Nat'l Hydro Sys. v. M.A. Mortenson Co.*, 529 N.W.2d 690, 694 (Minn. 1995).  "Accordingly, we strictly construe such indemnity clauses" against the indemnitee (MCA).  *Id.*; *see also Just.*, 979 N.W.2d at 900 ("[B]oth indemnity clauses and exculpatory clauses are subject to the same standard of strict construction.").  MCA claims that because the clauses specifically except "grossly negligent behavior or intentional misconduct," it is understood that ordinary negligence is covered.  ECF No. 147 at 15 ("Any ambiguity that might be claimed to exist is addressed

25

by the fact that the Agreement excepts 'gross negligence' and 'intentional misconduct' – thus, any reader would be informed that under the exculpatory clause MCA is being released, in advance, for any conduct by MCA that constitutes ordinary negligence.").  But that sort of coverage-by-implication is squarely rejected in Minnesota law.  "For an indemnity clause to pass strict construction, the contract must include an 'express provision' that 'indemnif[ies] the indemnitee for liability occasioned by its own negligence; such an obligation will not be found by implication.'"  *Dewitt*, 910 N.W. at 417 (quoting *Farmington Plumbing & Heating Co. v. Fischer Sand & Aggregate, Inc.*, 281 N.W.2d 838, 842 (Minn. 1979).  Considering that such clauses are "disfavor[ed]" and their enforceability "usually cannot be resolved on a Rule 12 motion," the better answer is to reject MCA's argument that the claims are barred by the contract terms.  *Id.* at 416; *Untiedt's Vegetable Farm, Inc.*, 493 F. Supp. 3d at 766.

Besides unenforceability, the Armed Forces Office's primary argument is that the specific clauses at issue do not apply to MCA's actions.  The exculpatory clause applies to claims "arising out of the performance of MCA of the services contemplated by the Agreement."  Ex. R § 6.1.[10]   The Armed Forces Office argues that because MCA negotiated a *higher* price on one instance (when it was supposed to negotiate lower prices), it was not "performing" under the contract.  ECF No. 171 at 5–8, 10–13.  A review of the applicable contract clauses confirms the contract is filled with references to *lowering* the

---

[10]    Similarly, the indemnity clause applies to "claims made or causes of action . . . arising out of or relating to the MCA services or other matters authorized by [the Armed Forces Office] pursuant to this Agreement."  Ex. R § 6.2.

cost of treatment, and the Armed Forces Office's reading is plausible.  The first recital clause confirms that the Armed Forces Office "would like to realize a lower price" for treatments. Ex. R at 1 (under "WHEREAS").  The "Patient Authorization" clause provides that the Armed Forces Office "authorizes MCA to act as the Patient's authorized personal representative for the purpose of obtaining a *reduction* in the cost" of treatment. *Id.* § 1.5 (emphasis added).   Another section—"Retrospective Negotiation"—refers to the "Adjusted Price" that MCA procures as "the *reduced price* the provider is willing to accept for the procedure after MCA negotiation." *Id.* § 2.1 (emphasis added).  Plainly, the Armed Forces Office contracted with MCA for price reductions.  It has plausibly alleged that MCA acted outside the scope of performance when it obtained a higher rate for invoice 6023. MCA's motion to dismiss Claim 6 will be denied.

F

In its seventh claim, the Armed Forces Office alleges MCA breached a fiduciary duty to it when MCA negotiated the Preferred Rate Agreements in its own self-interest, by disrupting a "simple" negotiation and payment process, by giving the Armed Forces Office ambiguous payment instructions, and by disclosing confidential information to Fairview. Am. Countercl. ¶¶ 214–22.  MCA moves to dismiss the claim in its entirety.  ECF No. 147. MCA again argues the claim is barred by the agreement's terms.  ECF No. 147 at 11, 16.

In Minnesota, a breach-of-fiduciary-duty claim has four elements: "[1] duty, [2] breach, [3] causation, and [4] damages." *Hansen v. U.S. Bank Nat'l Ass'n*, 934 N.W.2d 319, 327 (Minn. 2019).  "A fiduciary relationship is characterized by a 'fiduciary' who enjoys a superior position in terms of knowledge and authority and in whom the other party

27

places a high level of trust and confidence." *Carlson v. SALA Architects, Inc.*, 732 N.W.2d 324, 330–31 (Minn. Ct. App. 2007) (citing *Toombs v. Daniels*, 361 N.W.2d 801, 809 (Minn. 1985)). As explained in the December 2023 order, the Armed Forces Office has plausibly alleged a de facto fiduciary relationship existed between it and MCA. *See Fairview Health Servs.*, 705 F. Supp. 3d at 916. Further, "in Minnesota, an agent owes fiduciary duties to its principal," *U.S. Bank Nat'l Ass'n v. San Antonio Cash Network*, 252 F. Supp. 3d 714, 721 (D. Minn. 2017), and the Armed Forces Office has sufficiently alleged it engaged MCA as its agent, *see Fairview Health Servs.*, 705 F. Supp. 3d at 916; *see also* Am. Countercl. ¶¶ 39(a), 195, 209, 232; *see also* Ex. R § 1.4 ("MCA will be an agent for Client . . . .").

MCA primarily argues the breach-of-fiduciary-duty claim must be dismissed because the exculpatory and indemnity clauses discussed above bar these claims. The enforceability of the exculpatory and indemnity clauses was discussed—and MCA's argument was rejected—above. For the same reasons, MCA's release/indemnity argument is rejected here.

Secondarily, MCA argues, albeit briefly, that the Armed Forces Office's alleged harm is theoretical or implausible. ECF No. 147 at 11, 12 n.3. MCA has a point. For example, the Armed Forces Office alleges MCA breached its fiduciary duty "by forwarding approximately 20 confidential emails to Fairview without the AFO's knowledge, permission, or consent." Am. Countercl. ¶ 221. Recall that the Armed Forces Office and MCA agreed to hold each other's confidential information in "strict confidence." *Id.* ¶ 39(f)–(g); *see also* Ex. R § 4.2. The Armed Forces Office plausibly alleges MCA

breached its duty to hold its confidential information in confidence by sharing with Fairview several confidential emails and other communications. Am. Countercl. ¶¶ 109–10. The Armed Forces Office asserts generally that it lost $1.3 million due to MCA's breach and was forced to pay MCA $7,875 in searching for the checks, but the $1.3-million loss had already occurred by the time the confidential emails were shared, and it is unclear how sharing those emails could have resulted in MCA investigation fees. *See id.* ¶ 225(a), (c).

Other of the Armed Forces Office's breach-of-fiduciary-duty claims get closer to plausibly supporting a damages theory. For example, the Armed Forces Office alleges MCA breached its fiduciary duty "giving the [Armed Forces Office] confusing and ambiguous instructions and communications regarding payee information for the Checks." Am. Countercl. ¶ 220. Recall that MCA is the entity that asked the Armed Forces Office to send payment "*for Minnesota Medicine*" to Fairview and include "Attention Maureen Ring." *Id.* ¶ 88. It is plausible, then, that the Armed Forces Office relied on its agent for payment instructions when making the checks payable to Minnesota Medicine. But, again, the Armed Forces Office did not follow those instructions. It neglected to include "Attention Maureen Ring" on the package or the checks, and Fairview forward them to MIM. It would strain plausibility to say MCA breached its fiduciary duty to the Armed Forces Office when the Armed Forces Office did not follow MCA's instructions. It is plausible that the exculpatory and indemnity clauses are unenforceable, but the Armed Forces Office still does not plausibly allege damages stemming from a breach of fiduciary duty. MCA's motion to dismiss Claim 7 will be granted.

G

The Armed Forces Office asserts that, to the extent it is found liable to Fairview, it is entitled to contribution from MCA.  Am. Countercl. ¶ 237.  MCA argues that the agreement the Armed Forces Office and MCA entered precludes contribution because the Armed Forces Office agreed it would assume sole responsibility for payments and would indemnify MCA.  ECF No. 147 at 11–12.

"Contribution is an equitable doctrine that requires that persons under a common burden share that burden equitably."  *Far E. Aluminium Works Co. v. Viracon, Inc.*, 520 F. Supp. 3d 1106, 1115 (D. Minn. 2021) (quoting *Nuessmeier Elec., Inc. v. Weiss Mfg. Co.*, 632 N.W.2d 248, 251 (Minn. Ct. App. 2001)).  "Contribution requires proof of '(1) common liability of two or more actors to the injured party; and (2) the payment by one of the actors of more than its fair share of that common liability.'"  *Id.* (quoting *Nuessmeier Elec.*, 632 N.W.2d at 251).  "Common liability 'arises when both parties are liable to the injured party for part or all of the same damages.'"  *Id.* (quoting *Nuessmeier Elec.*, 632 N.W.2d at 251).

In the previous round of Rule 12 motions, the Armed Forces Office's contribution claim against MCA was dismissed because all of its other claims against MCA were dismissed.  *See Fairview Health Servs.*, 705 F. Supp. 3d at 918 ("The Armed Forces Office does not—and could not—plausibly allege that it and MCA share common liability to Fairview.  MCA's motion will be granted as to [contribution].")  Now, however, because the Armed Forces Office's breach-of-contract claim against MCA (Claim 6) survives, the contribution claim should survive as well.

IV

Fairview moves to strike one of the Armed Forces Office's affirmative defenses pursuant to Rule 12(f). In the Armed Forces Office's Amended Answer, it asserts eighteen affirmative defenses, and "reserves the right to assert additional affirmative defenses that may be identified in discovery." Am. Answer [ECF No. 130] at 10–12, ¶¶ A–S. One of the affirmative defenses, labeled "G," states in full, "Fairview's claims are barred in whole or in part by Fairview's own comparative fault." *Id.* at 11, ¶ G. Fairview moves to strike the affirmative defense as insufficient as a matter of law.

A party may move to strike "from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f)(2). "The court may grant a motion to strike an affirmative defense only if no questions of law or fact exist and the defense sought to be stricken could not succeed under any set of circumstances." *First Bank Sys., Inc. v. Martin*, 782 F. Supp. 425, 426 (D. Minn. 1991). Motions to strike are "viewed with disfavor and are infrequently granted." *Lunsford v. United States*, 570 F.2d 221, 229 (8th Cir. 1977). "A motion to strike a defense will be denied if the defense is sufficient as a matter of law or if it fairly presents a question of law or fact which the court ought to hear." *Id.* (quoting 2A *Moore's Federal Practice* P 12.21 at 2437 (2d ed. 1975)).

Fairview sued the Armed Forces Office for breach of contract, quantum meruit, and breach of the implied covenant of good faith and fair dealing. Compl. ¶¶ 26–39. It argues that because its claims are based in breach of contract, a comparative fault defense fails as a matter of law. ECF No. 154 at 9–11. It is true that the Minnesota Supreme Court has

31

said the comparative-fault statute, Minn. Stat. § 604.02, subdiv. 1 (2023), does not apply to contract claims. *Leamington Co. v. Nonprofits' Ins. Ass'n*, 661 N.W.2d 674, 677–78 (Minn. Ct. App. 2003) (citing *Lesmeister v. Dilly*, 330 N.W.2d 95, 101–02 (Minn. 1983). Minnesota courts have consistently held the same. *See Sander & Co. v. N. Cap. Ins.*, No. A06-971, 2007 WL 1893063, at *3 (Minn. Ct. App. July 3, 2007) ("[T]he district court applied a negligence-based remedy rather than a contract-based remedy .... The comparative-fault statute, however, does not apply to contract claims."); *Residential Funding Co., LLC v. First Mortg. Corp.*, No. 13-cv-3490 (SRN/HB), 2018 WL 6727065, at *12 (D. Minn. Dec. 21, 2018) ("Defendant appears to invoke the concept of comparative negligence or comparative fault from tort law, which has no bearing in this contractual indemnification action."); *Sievert v. LaMarca*, 367 N.W.2d 580, 588 (Minn. Ct. App. 1985) ("We are mindful of the fact that ordinarily the comparative fault statute does not apply to contract cases.").

The Armed Forces Office's contrary argument is not persuasive. It cites *Mike's Fixtures, Inc. v. Bombard's Access Floor Sys., Inc.*, 354 N.W.2d 837 (Minn. Ct. App. 1984). ECF No. 163 at 4–5. In *Mike's Fixture's*, the court explained that Minnesota's comparative fault statute was not intended to apply to contract cases because (1) "contract law has never spoken in terms of fault," and (2) "the statute derives from the Uniform Comparative Fault Act," which says "[t]here is no intent to include in the coverage of the Act actions that are fully contractual in their gravamen and in which the plaintiff is suing solely because he did not recover what he contracted to receive." *Mike's Fixture's*, 354 N.W.2d at 839–40 (quoting *Lesmeister*, 330 N.W.2d at 101–02). But, it concluded, "as to

items of consequential damage, the unreasonable failure to mitigate damages is 'fault' which can be apportioned under the comparative fault statute." *Id.* at 840.  The Armed Forces Office already asserted Fairview's failure to mitigate as an affirmative defense. Am. Answer at 11, ¶ F.  And its damages claims ($1.3 million in lost funds and $7,875 in payment to MCA to search for the lost checks) cannot reasonably be understood as consequential damages.  Consequential damages "are, for lack of a better word, 'the *consequence* of special circumstances known to or reasonably supposed to have been contemplated by the parties when the contract was made.'" *Far E. Aluminium Works Co. v. Viracon, Inc.*, 27 F.4th 1361, 1365 (8th Cir. 2022) (quoting *Kleven v. Geigy Agric. Chems.*, 227 N.W.2d 566, 569 (Minn. 1975)).  "The prototypical example is a loss of profits from missing a delivery date." *Id.*  The checks being lost, stolen, or made payable to the wrong party, and the ensuing fees paid to search for the checks, do not appear to have been contemplated by the parties when the contracts were made, and the Armed Forces Office presents no credible argument that they were.  *See* ECF No. 165 at 13–16.  The situations to which the comparative fault statute might apply to contract claims are not present here. Affirmative Defense G is insufficient as a matter of law and does not fairly present a question which the court ought to hear.  *See Lunsford*, 570 F.2d at 229.  The defense will be stricken.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.     Fairview Health Services' Motion to Dismiss the Armed Forces Office's Amended Counterclaim [ECF No. 148] is **GRANTED**.  Claims 1 and 2 are **DISMISSED with prejudice**.

2.     Sherif Saad's Motion to Dismiss [ECF No. 166] is **DENIED**.

3.     Medical Cost Advocate, Inc.'s Motion to Dismiss Armed Forces Office of Royal Embassy of Saudi Arabia's Amended Third-Party Complaint [ECF No. 146] is **GRANTED in part**.  Claim 7 is **DISMISSED with prejudice**.  The motion is in all other respects **DENIED**.

4.     Fairview's Motion to Strike the Armed Forces Office's Affirmative Defense G [ECF No. 153] is **GRANTED**.


Dated:  October 10, 2024                    s/ Eric C. Tostrud
                                            Eric C. Tostrud
                                            United States District Court